FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 05 2018

JAMES W. McCORMACK, CLERK
By: [signature]
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

TIMOTHY S. KEATHLEY
a/k/a SHANE KEATHLEY — PLAINTIFF

VS. NO. 4:18-cv-383-BSM

LIBERTY LIFE ASSURANCE COMPANY OF BOSTON — DEFENDANT

This case assigned to District Judge Miller
and to Magistrate Judge Harris

**COMPLAINT**

COMES NOW Plaintiff, Timothy S. Keathley ("Keathley"), by and through his attorney, Daniel A. Webb, and for his complaint states:

**PARTIES AND JURISDICTION**

1. This is an action to recover long term disability benefits pursuant to section 502(a), (e)(1) and (f) of the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1132(a), (e)(1) and (f).

2. This Court has federal question subject matter jurisdiction and personal jurisdiction over the parties and is the proper venue pursuant to 28 U.S.C. § 1391(b).

3. Plaintiff, Keathley, is a resident of Faulkner County, Arkansas. Keathley participated in a group disability income policy plan the ("Plan") for long term disability benefits while employed by Axiom Corporation. (See Plan attached as exhibit A)

4. Defendant, Liberty Life Assurance Company of Boston ("Liberty") is an insurance company doing business in Arkansas.

5. The Plan is underwritten by Liberty and sponsored by Axiom Corporation.

## FACTS

6. While employed by Axiom and a Plan participant, Keathley suffered a massive anterior myocardial infarction which resulted in cardiomyopathy and the installation of a biventricular ICD implant.

7. Keathley's conditions, including but not limited to coronary artery disease, congestive heart failure New York Heart Association Class III, sleep apnea, anxiety/depression, hyperlipedemia and hypertension, have rendered him totally and permanently disabled, and he suffers from severe fatigue and physical limitations such that he is unable to perform even sedentary work on a sustained basis.

8. Initially, the Plan paid benefits to Keathley, but on or about November of 2017; despite Keathley's severe medical problems, Liberty, without legal justification, stopped paying benefits to Keathley and continues to refuse to pay Keathley the long-term disability benefits owed.

9. Keathley has complied with all conditions precedent to entitle him to benefits under the Plan and to file this lawsuit.

10. Keathley received a final denial from the Plan on or about May 10, 2018. (See denial letter attached as exhibit B)

11. Keathley was approved for Social Security disability and payments began June of 2016. An offset for benefits payable by the Plan may be applicable. (See Award letter attached Exhibit C)

12. The Plan is underwritten by Liberty and its subsidiaries function as the claims administrators. Liberty and its subsidiary claims adjustors are the

fiduciaries responsible for approving or denying claims under the Plan and paying approved claims. Accordingly, Liberty maintains a conflict of interest in the present situation.

13. Keathley has been forced to retain the services of counsel in order to bring this action, and Liberty is obligated to pay attorney fees in addition to the unpaid benefits owed Keathley.

14. It is appropriate under these circumstances to award Keathley pre-judgment interest in addition to awarding him back benefits and current benefits under the Plan.

WHEREFORE, Plaintiff prays for an order awarding him: back benefits, current benefits and future benefits pursuant to the Plan, pre-judgment interest, attorney's fees, costs and all other appropriate and proper relief.

Respectfully submitted,

DANIEL A. WEBB, Ark. Bar No. 2000113
111 Center Street, Suite 1200
Little Rock, Arkansas 72201
(501) 372-2400

EXHIBIT
A

# LIMITATIONS AND EXCLUSIONS UNDER THE ARKANSAS LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION ACT

Residents of this state who purchase life insurance, annuities or health and accident insurance should know that the insurance companies licensed in this state to write these types of insurance are members of the Arkansas Life and Health Insurance Guaranty Association ("Guaranty Association"). The purpose of the Guaranty Association is to assure that policy and contract owners will be protected, within certain limits, in the unlikely event that a member insurer becomes financially unable to meet its obligations. If this should happen, the Guaranty Association will assess its other member insurance companies for the money to pay the claims of policy owners who live in this state and, in some cases, to keep coverage in force. The valuable extra protection provided by the member insurers through the Guaranty Association is not unlimited, however. And, as noted in the box below, this protection is not a substitute for consumers' care in selecting insurance companies that are well managed and financially stable.

DISCLAIMER

The Arkansas Life and Health Insurance Guaranty Association ("Guaranty Association") may not provide coverage for this policy. If coverage is provided, it may be subject to substantial limitations or exclusions and require continued residency in this state. You should not rely on coverage by the Guaranty Association in purchasing an insurance policy or contract.

Coverage is NOT provided for your policy or contract or any portion of it that is not guaranteed by the insurer or for which you have assumed the risk, such as non-guaranteed amounts held in a separate account under a variable life or variable annuity contract.

Insurance companies or their agents are required by law to provide you with this notice. However, insurance companies and their agents are prohibited by law from using the existence of the Guaranty Association to induce you to purchase any kind of insurance policy.

The Arkansas Life and Health Insurance Guaranty Association
c/o The Liquidation Division
1023 West Capitol
Little Rock, Arkansas 72201

Arkansas Insurance Department
1200 West Third Street
Little Rock, Arkansas 72201-1904

The state law that provides for this safety-net is called the Arkansas Life and Health Insurance Guaranty Association Act ("Act"). Below is a brief summary of the Act's coverages, exclusions and limits. This summary does not cover all provisions of the Act; nor does it in any way change anyone's rights or obligations under the Act or the rights or obligations of the Guaranty Association.

## COVERAGE

Generally, individuals will be protected by the Guaranty Association if they live in this state and hold a life, annuity or health insurance contract or policy, or if they are insured under a group insurance contract issued by a member insurer. The beneficiaries, payees or assignees of policy or contract owners are protected as well, even if they live in another state.

## EXCLUSIONS FROM COVERAGE

However, persons owning such policies are NOT protected by the Guaranty Association if:

- They are eligible for protection under the laws of another state (this may occur when the insolvent insurer was incorporated in another state whose guaranty association protects insureds who live outside that state);
- The insurer was not authorized to do business in this state;

- Their policy or contract was issued by a nonprofit hospital or medical service organization, an HMO, a fraternal benefit society, a mandatory state pooling plan, a mutual assessment company or similar plan in which the policy or contract owner is subject to future assessments, or by an insurance exchange.

The Guaranty Association also does NOT provide coverage for:

- Any policy or contract or portion thereof which is not guaranteed by the insurer or for which the owner has assumed the risk, such as non-guaranteed amounts held in a separate account under a variable life or variable annuity contract;
- Any policy of reinsurance (unless an assumption certificate was issued);
- Interest rate yields that exceed an average rate;
- Dividends and voting rights and experience rating credits;
- Credits given in connection with the administration of a policy by a group contract holder;
- Employers' plans to the extent they are self-funded (that is, not insured by an insurance company, even if an insurance company administers them);
- Unallocated annuity contracts (which give rights to group contractholders, not individuals);
- Unallocated annuity contracts issued to/in connection with benefit plans protected under Federal Pension Benefit Corporation ("FPBC")(whether the FPBC is yet liable or not);
- Portions of an unallocated annuity contract not owned by a benefit plan or a government lottery (unless the owner is a resident) or issued to a collective investment trust or similar pooled fund offered by a bank or other financial institution);
- Portions of a policy or contract to the extent assessments required by law for the Guaranty Association are preempted by State or Federal law;
- Obligations that do not arise under the policy or contract, including claims based on marketing materials or side letters, riders or other documents which do not meet filing requirements, or claims for policy misrepresentations, or extra-contractual or penalty claims;
- Contractual agreements establishing the member insurer's obligations to provide book value accounting guarantees for defined contribution benefit plan participants (by reference to a portfolio of assets owned by a nonaffiliate benefit plan or its trustees).

**LIMITS ON AMOUNT OF COVERAGE**

The Act also limits the amount the Guaranty Association is obligated to cover: The Guaranty Association cannot pay more than what the insurance company would owe under a policy or contract. Also, for any one insured life, the Guaranty Association will pay a maximum of $300,000 - no matter how many policies and contracts there were with the same company, even if they provided different types of coverages. Within this overall $300,000 limit, the Association will not pay more than $300,000 in health insurance benefits, $300,000 in present value of annuity benefits, or $300,000 in life insurance death benefits or net cash surrender values - again, no matter how many policies and contracts there were with the same company, and no matter how many different types of coverages. There is a $1,000,000 limit with respect to any contract holder for unallocated annuity benefits, irrespective of the number of contracts held by the contract holder. These are limitations for which the Guaranty Association is obligated before taking into account either its subrogation and assignment rights or the extent to which those benefits could be provided out of the assets of the impaired or insolvent insurer.

Liberty Mutual.
INSURANCE

Liberty Life Assurance Company of Boston

# GROUP DISABILITY INCOME POLICY

**Sponsor:** **Acxiom Corporation**

**Policy Number:** **GF3-840-444153-01**

**Effective Date:** **January 1, 2014**

**Governing Jurisdiction** is **Arkansas** and subject to the laws of that State.

**Premiums** are due and payable monthly on the first day of each month.

**Policy Anniversaries** shall occur each January 1st beginning in 2015.

Liberty Life Assurance Company of Boston (hereinafter referred to as Liberty) agrees to pay benefits provided by this policy in accordance with its provisions. This policy provides Long Term Disability coverage.

**PLEASE READ THIS POLICY CAREFULLY FOR FULL DETAILS.**

This policy is a legal contract and is issued in consideration of the Application of the Sponsor, a copy of which is attached, and of the payment of premiums by the Sponsor.

For purposes of this policy, the Sponsor acts on its own behalf or as the Covered Person's agent. Under no circumstances will the Sponsor be deemed the agent of Liberty.

This policy is delivered in and governed by the laws of the governing jurisdiction and to the extent applicable by The Employee Retirement Income Security Act of 1974 (ERISA) and any subsequent amendments.

The following pages including any amendments, riders or endorsements are a part of this policy.

Signed at Liberty's Home Office, 175 Berkeley Street, Boston, Massachusetts, 02117

SECRETARY PRESIDENT

**NON-PARTICIPATING**

**FORM ADOP**

## TABLE OF CONTENTS

SECTION 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SCHEDULE OF BENEFITS

SECTION 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DEFINITIONS

SECTION 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ELIGIBILITY AND EFFECTIVE DATES

SECTION 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DISABILITY INCOME BENEFITS

SECTION 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . EXCLUSIONS

SECTION 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . TERMINATION PROVISIONS

SECTION 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . GENERAL PROVISIONS

SECTION 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PREMIUMS

SECTION 9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . APPLICATION

# SECTION 1 - SCHEDULE OF BENEFITS

**ELIGIBILITY REQUIREMENTS FOR INSURANCE BENEFITS**

**Minimum Hourly Requirement:**

Employees working a minimum of 30 regularly scheduled hours per week

**Long Term Disability Benefits:**

Class 1: All full-time Employees on the U.S. payroll

**Note:** Temporary and seasonal Employees and Employees who are not United States citizens or legal residents working in the United States are not covered under this policy.

**Eligibility Waiting Period:**

1. If the Covered Person is employed by the Sponsor on the policy effective date - None

2. If the Covered Person begins employment for the Sponsor after the policy effective date - None

**Employee Contributions Required:**

No

**Name of Associated Companies:**

Digital Impact, Inc.
177 Bovet Road
San Mateo, CA 94402 USA

Acxiom Direct, Inc.
601 E. Third Street
Little Rock, AR 72201 USA

Acxiom IT Outsourcing, Inc.
1501 Opus Pl.
Downers Grove, IL 60515 USA

LiveRamp, Inc.
667 Mission Street
San Francisco, CA 94105 USA

## SECTION 1 - SCHEDULE OF BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE**

**Elimination Period:**

The greater of:

a. the end of the Covered Person's Short Term Disability Benefits; or

b. 180 days

**Amount of Insurance:**

60.00% of Basic Monthly Earnings not to exceed a Maximum Monthly Benefit of $15,000.00 less Other Income Benefits and Other Income Earnings as outlined in Section 4.

**Maximum Basic Monthly Earnings on which the Benefit is Based:** $25,000.00

**Own Occupation Duration:**

24 Month Own Occupation

## SECTION 1 - SCHEDULE OF BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Minimum Monthly Benefit:**

The Minimum Monthly Benefit is $100.00 or 10.00% of the Covered Person's Gross Monthly Benefit, whichever is greater.

**Maximum Benefit Period:**

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than age 60 | Greater of SSNRA* or to age 65 (but not less than 5 years) |
| 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 and over | 12 months |

* SSNRA means the Social Security Normal Retirement Age as figured by the 1983 amendment to the Social Security Act and any subsequent amendments and provides:

| Year of Birth | Normal Retirement Age |
|---|---|
| Before 1938 | 65 |
| 1938 | 65 and 2 months |
| 1939 | 65 and 4 months |
| 1940 | 65 and 6 months |
| 1941 | 65 and 8 months |
| 1942 | 65 and 10 months |
| 1943-1954 | 66 |
| 1955 | 66 and 2 months |
| 1956 | 66 and 4 months |
| 1957 | 66 and 6 months |
| 1958 | 66 and 8 months |
| 1959 | 66 and 10 months |
| 1960 and after | 67 |

## SECTION 2 - DEFINITIONS

In this section Liberty defines some basic terms needed to understand this policy. The male pronoun whenever used in this policy includes the female.

**"Active Employment"** means the Employee must be actively at work for the Sponsor:

1. on a full-time basis and paid regular earnings;

2. for at least the minimum number of hours shown in the Schedule of Benefits; and either perform such work:

   a. at the Sponsor's usual place of business; or
   b. at a location to which the Sponsor's business requires the Employee to travel.

An Employee will be considered actively at work if he was actually at work on the day immediately preceding:

1. a weekend (except where one or both of these days are scheduled work days);
2. holidays (except when the holiday is a scheduled work day);
3. paid vacations;
4. any non-scheduled work day;
5. an excused leave of absence (except medical leave for the Covered Person's own disabling condition and lay-off); and
6. an emergency leave of absence (except emergency medical leave for the Covered Person's own disabling condition).

**"Administrative Office"** means Liberty Life Assurance Company of Boston, 9 Riverside Road, Weston, MA 02493.

## SECTION 2 - DEFINITIONS
(Continued)

**"Any Occupation"** means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity.

**"Application"** is the document designated in Section 9; it is attached to and is made a part of this policy.

**"Appropriate Available Treatment"** means care or services which are:

1. generally acknowledged by Physicians to cure, correct, limit, treat or manage the disabling condition;
2. accessible within the Covered Person's geographical region;
3. provided by a Physician who is licensed and qualified in a discipline suitable to treat the disabling Injury or Sickness;
4. in accordance with generally accepted medical standards of practice.

**"Basic Monthly Earnings"** means the Covered Person's monthly rate of earnings from the Sponsor in effect immediately prior to the date Disability or Partial Disability begins. However, such earnings will not include overtime pay and extra compensation other than commissions and bonuses. Commissions and bonuses will be averaged over the lesser of (a) the 12 month period prior to the date Disability begins; or (b) the period of employment.

**"Consumer Price Index"** means the government publication "The Consumer Price Index for Urban Wage Earners and Clerical Workers" provided monthly by the U.S. Department of Labor, or its successor or in the event of no successor a similar Index of comparable purpose chosen by Liberty.

**"Covered Person"** means an Employee insured under this policy.

## SECTION 2 - DEFINITIONS
(Continued)

**"Disability"** or **"Disabled"** means:

1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:

   i. that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

   ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

2. With respect to Covered Persons employed as pilots, co-pilots and crewmembers of an aircraft:

   **"Disability"** or **"Disabled"** means as a result of Injury or Sickness the Covered Person is unable to perform the Material and Substantial Duties of Any Occupation.

**"Disability Benefits under a Retirement Plan"** means money which:

1. is payable under a Retirement Plan due to Disability as defined in that plan; and
2. does not reduce the amount of money which would have been paid as retirement benefits at the normal retirement age under the plan if the Disability had not occurred. (If the payment does cause such a reduction, it will be deemed a Retirement Benefit as defined in this policy.)

## SECTION 2 - DEFINITIONS
(Continued)

**"Eligibility Date"** means the date an Employee becomes eligible for insurance under this policy. Eligibility Requirements are shown in the Schedule of Benefits.

**"Eligible Survivor"** means the Covered Person's spouse, if living, otherwise the Covered Person's children under age 25.

**"Eligibility Waiting Period"** means the continuous length of time an Employee must be in Active Employment in an eligible class to reach his Eligibility Date.

**"Elimination Period"** means a period of consecutive days of Disability or Partial Disability for which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability.

If the Covered Person returns to work for any one hundred eighty or fewer days during the Elimination Period and cannot continue, Liberty will count only those days the Covered Person is Disabled or Partially Disabled to satisfy the Elimination Period.

**"Employee"** means a person in Active Employment with the Sponsor.

**"Enrollment Form"** is the document completed by the Covered Person, if required, when enrolling for coverage. This form must be satisfactory to Liberty.

## SECTION 2 - DEFINITIONS
(Continued)

**"Extended Treatment Plan"** means continued care that is consistent with the American Psychiatric Association's standard principles of Treatment, and is in lieu of confinement in a Hospital or Institution. It must be approved in writing by a Physician.

**"Family and Medical Leave"** means a leave of absence for the birth, adoption or foster care of a child, or for the care of the Covered Person's child, spouse or parent or for the Covered Person's own serious health condition as those terms are defined by the Federal Family and Medical Leave Act of 1993 (FMLA) and any amendments, or by applicable state law.

**"Gross Monthly Benefit"** means the Covered Person's Monthly Benefit before any reduction for Other Income Benefits and Other Income Earnings.

**"Hospital"** or **"Institution"** means a facility licensed to provide Treatment for the condition causing the Covered Person's Disability.

## SECTION 2 - DEFINITIONS
(Continued)

**"Indexed Basic Monthly Earnings"** means the Covered Person's Basic Monthly Earnings in effect just prior to the date Disability or Partial Disability began adjusted on the first anniversary of benefit payments and each anniversary thereafter.

**"Initial Enrollment Period"** means one of the following periods during which an Employee may first enroll for coverage under this policy:

1. for an Employee who is eligible for insurance on the policy effective date, a period before the policy effective date set by the Sponsor and Liberty.

2. for an Employee who becomes eligible for insurance after the policy effective date, the period which ends 31 days after his Eligibility Date.

**"Injury"** means bodily impairment resulting directly from an accident and independently of all other causes. For the purpose of determining benefits under this policy:

1. any Disability which begins more than 60 days after an Injury will be considered a Sickness; and

2. any Injury which occurs before the Covered Person is covered under this policy, but which accounts for a medical condition that arises while the Covered Person is covered under this policy will be treated as a Sickness.

**"Last Monthly Benefit"** means the gross Monthly Benefit payable to the Covered Person prior to his death without any reduction for earnings received from employment.

**"Material and Substantial Duties"** means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.

## SECTION 2 - DEFINITIONS
(Continued)

**"Mental Illness"** means a psychiatric or psychological condition classified as such in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) regardless of the underlying cause of the Mental Illness. If the DSM is discontinued, Liberty will use the replacement chosen or published by the American Psychiatric Association.

**"Monthly Benefit"** means the monthly amount payable by Liberty to the Disabled or Partially Disabled Covered Person.

**"Own Occupation"** means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy.

## SECTION 2 - DEFINITIONS
(Continued)

**"Partial Disability" or "Partially Disabled"** means the Covered Person, as a result of Injury or Sickness, is able to:

1. perform one or more, but not all, of the Material and Substantial Duties of his Own Occupation or Any Occupation on an Active Employment or a part-time basis; or
2. perform all of the Material and Substantial Duties of his Own Occupation or Any Occupation on a part-time basis; and
3. earn between 20.00% and 80.00% of his Basic Monthly Earnings.

**"Physician"** means a person who:

1. is licensed to practice medicine and is practicing within the terms of his license; or
2. is a licensed practitioner of the healing arts in a category specifically favored under the health insurance laws of the state where the Treatment is received and is practicing within the terms of his license.

It does not include a Covered Person, any family member or domestic partner.

## SECTION 2 - DEFINITIONS
(Continued)

**"Proof"** means the evidence in support of a claim for benefits and includes, but is not limited to, the following:

1. a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;

2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and

3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

Proof must be submitted in a form or format satisfactory to Liberty.

**"Regular Attendance"** means the Covered Person's personal visits to a Physician which are medically necessary according to generally accepted medical standards to effectively manage and treat the Covered Person's Disability or Partial Disability.

**"Retirement Benefit under a Retirement Plan"** means money which:

1. is payable under a Retirement Plan either in a lump sum or in the form of periodic payments;

2. does not represent contributions made by an Employee (payments which represent Employee contributions are deemed to be received over the Employee's expected remaining life regardless of when such payments are actually received); and

3. is payable upon:

   a. early or normal retirement; or
   b. Disability, if the payment does reduce the amount of money which would have been paid under the plan at the normal retirement age.

## SECTION 2 - DEFINITIONS
(Continued)

**"Retirement Plan"** means a plan which provides retirement benefits to Employees and which is not funded wholly by Employee contributions. The term shall not include a profit-sharing plan, informal salary continuation plan, registered retirement savings plan, stock ownership plan, 401(K) or a non-qualified plan of deferred compensation.

**"Schedule of Benefits"** means the section of this policy which shows, among other things, the Eligibility Requirements, Eligibility Waiting Period, Elimination Period, Amount of Insurance, Minimum Benefit, and Maximum Benefit Period.

**"Sickness"** means illness, disease, pregnancy or complications of pregnancy.

**"Sponsor"** means the entity to whom this policy is issued.

**"Sponsor's Retirement Plan"** is deemed to include any Retirement Plan:

1. which is part of any Federal, State, Municipal or Association retirement system; or
2. for which the Employee is eligible as a result of employment with the Sponsor.

**"Substance Abuse"** means alcohol and/or drug abuse, addiction or dependency.

**"Treatment"** means consulting, receiving care or services provided by or under the direction of a Physician including diagnostic measures, being prescribed drugs and/or medicines, whether the Covered Person chooses to take them or not, and taking drugs and/or medicines.

# SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES

**Eligibility Requirements for Insurance Benefits**

The eligibility requirements for insurance benefits are shown in the Schedule of Benefits.

**Eligibility Date for Insurance Benefits**

An Employee in an eligible class will qualify for insurance on the later of:

1. this policy's effective date; or
2. the day after the Employee completes the Eligibility Waiting Period shown in the Schedule of Benefits.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Effective Date of Insurance**

Insurance will be effective at 12:01 A.M. Standard Time in the governing jurisdiction on the day determined as follows, but only if the Employee's application or enrollment for insurance is made with Liberty through the Sponsor in a form or format satisfactory to Liberty.

An Employee will be insured on his Eligibility Date.

**Delayed Effective Date for Insurance**

The effective date of any initial, increased or additional insurance will be delayed for an individual if he is not in Active Employment because of Injury or Sickness. The initial, increased or additional insurance will begin on the date the individual returns to Active Employment.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Family and Medical Leave**

An Employee's coverage may be continued under this policy for an approved family or medical leave of absence for up to 12 weeks following the date coverage would have terminated, subject to the following:

1. the authorized leave is in writing;

2. the required premium is paid;

3. the Covered Person's benefit level, or the amount of earnings upon which the Covered Person's benefit may be based, will be that in effect on the date before said leave begins; and

4. continuation of coverage will cease immediately if any one of the following events should occur:

   a. the Covered Person returns to work;
   b. this group insurance policy terminates;
   c. the Covered Person is no longer in an eligible class;
   d. nonpayment of premium when due by the Sponsor or the Covered Person;
   e. the Covered Person's employment terminates.

**Rehire Terms**

If a former Employee is re-hired by the Sponsor within 60 days of his termination date, all past periods of Active Employment with the Sponsor will be used in determining the re-hired Employee's Eligibility Date. If a former Employee is re-hired by the Sponsor more than 60 days after his termination date, he is considered to be a new Employee when determining his Eligibility Date.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Leave of Absence**

The Sponsor may continue the Covered Person's coverage(s) by paying the required premiums, if the Covered Person is given a leave of absence

The Covered Person's coverage will not continue beyond the end of the policy month in which the leave of absence begins. In continuing such coverage under this provision, the Sponsor agrees to treat all Covered Persons equally.

**Lay-off**

The Sponsor may continue the Covered Person's coverage(s) by paying the required premiums, if the Covered Person is temporarily laid off.

The Covered Person's coverage will not continue beyond the end of the policy month in which the lay-off begins. In continuing such coverage under this provision, the Sponsor agrees to treat all Covered Persons equally.

**Associated Companies**

Companies, corporations, firms or individuals that are subsidiary to, or affiliated with, the Sponsor will be called Associated Companies. The Associated Companies, if any, are listed in the Schedule of Benefits. Employees of Associated Companies will be considered Employees of the Sponsor for purposes of this policy.

As they relate to this policy, all actions, agreements and notices between Liberty and the Sponsor will be binding on the Associated Companies.

If any Associated Companies cease to be Associated Companies for any reason, its Employees will be deemed to have transferred to a class of Employees not eligible for coverage under this policy.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Transfer Provision**

In order to prevent loss of coverage for an individual because of transfer of insurance carriers, this policy will provide coverage for certain individuals as follows:

**Failure to be In Active Employment Due to Injury or Sickness:**

Subject to premium payments, this policy will cover individuals who:

1. at the time of transfer are covered under the prior carrier's policy; and

2. are not in Active Employment due to Injury or Sickness on the effective date of this policy.

Benefits will be determined based on the lesser of:

1. the amount of the Disability benefit that would have been payable under the prior policy and subject to any applicable policy limitations; or

2. the amount of Disability benefits payable under this policy. If benefits are payable under the prior policy for the Disability, no benefits are payable under this policy.

**Disability Due to a Pre-Existing Condition**

If an individual was insured under the prior carrier's policy at the time of transfer and was in Active Employment and insured under this policy on its effective date, benefits may be payable for a Disability due to a Pre-Existing Condition.

If the individual can satisfy this policy's Pre-Existing Condition Exclusion, the benefit will be determined according to this policy.

If the individual cannot satisfy this policy's Pre-Existing Condition Exclusion, then:

1. Liberty will apply the Pre-Existing Condition Exclusion of the prior carrier's policy and;

2. if the individual would have satisfied the prior carrier's pre-existing condition exclusion, giving consideration towards continuous time coverage under this policy; and the prior carrier's policy, the benefit will be determined according to this policy. However, the Maximum Monthly Benefit amount payable under this policy shall not exceed the maximum monthly benefit payable under the prior carrier's policy.

No benefit will be paid if the individual cannot satisfy the Pre-Existing Condition Exclusions of either policy.

## SECTION 4 - DISABILITY INCOME BENEFITS

**LONG TERM DISABILITY COVERAGE**

**Disability Benefit**

When Liberty receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued:

1. Disability;
2. Regular Attendance of a Physician; and
3. Appropriate Available Treatment.

The Proof must be given upon Liberty's request and at the Covered Person's expense. In determining whether the Covered Person is Disabled, Liberty will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.

For purposes of determining Disability, the Injury must occur and Disability must begin while the Employee is insured for this coverage.

The Monthly Benefit will not:

1. exceed the Covered Person's Amount of Insurance; or
2. be paid for longer than the Maximum Benefit Period.

The Amount of Insurance and the Maximum Benefit Period are shown in the Schedule of Benefits.

**Amount of Disability Monthly Benefit**

To figure the amount of Monthly Benefit:

1. Take the lesser of:
   a. the Covered Person's Basic Monthly Earnings multiplied by the benefit percentage shown in the Schedule of Benefits; or
   b. the Maximum Monthly Benefit shown in the Schedule of Benefits; and then
2. Deduct Other Income Benefits and Other Income Earnings, (shown in the Other Income Benefits and Other Income Earnings provision of this policy), from this amount.

The Monthly Benefit payable will not be less than the Minimum Monthly Benefit shown in the Schedule of Benefits. However, if an overpayment is due to Liberty, the Minimum Monthly Benefit otherwise payable under this provision will be applied toward satisfying the overpayment.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Partial Disability**

When Liberty receives Proof that a Covered Person is Partially Disabled and has experienced a loss of earnings due to Injury or Sickness and requires the Regular Attendance of a Physician, he may be eligible to receive a Monthly Benefit, subject to any other provisions of this policy. To be eligible to receive Partial Disability benefits, the Covered Person may be employed in his Own Occupation or another occupation, must satisfy the Elimination Period and must be earning between 20.00% and 80.00% of his Basic Monthly Earnings.

A Monthly Benefit will be paid for the period of Partial Disability if the Covered Person gives to Liberty Proof of continued:

1. Partial Disability;
2. Regular Attendance of a Physician; and
3. Appropriate Available Treatment.

The Proof must be given upon Liberty's request and at the Covered Person's expense. In determining whether the Covered Person is Partially Disabled, Liberty will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.

For purposes of determining Partial Disability, the Injury must occur and Partial Disability must begin while the Employee is insured for this coverage.

**Proportionate Loss Monthly Calculation with Work Incentive Benefit**

For the first 12 Months, the work incentive benefit will be an amount equal to the Covered Person's Basic Monthly Earnings multiplied by the benefit percentage shown in the Schedule of Benefits, without any reductions from earnings. The work incentive benefit will only be reduced, if the Monthly Benefit payable plus any earnings exceed 100% of the Covered Person's Basic Monthly Earnings. If the combined total is more, the Monthly Benefit will be reduced by the excess amount so that the Monthly Benefit plus the Covered Person's earnings does not exceed 100% of his Basic Monthly Earnings.

Thereafter, to figure the Amount of Monthly Benefit the formula (A divided by B) x C will be used.

A = The Covered Person's Basic Monthly Earnings minus the Covered Person's earnings received while he is Partially Disabled. This figure represents the amount of lost earnings.

B = The Covered Person's Basic Monthly Earnings.

C = The Monthly Benefit as figured in the Disability provision of this policy plus the Covered Person's earnings received while he is Partially Disabled, (but, not including adjustments under the Cost of Living Adjustment Benefit, if included).

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Partial Disability** (Continued)

**Proportionate Loss Monthly Calculation with Work Incentive Benefit** (Continued)

On the first anniversary of benefit payments and each anniversary thereafter, for the purpose of calculating the benefit, the term "Basic Monthly Earnings" is:

1. replaced by "Indexed Basic Monthly Earnings"; and

2. increased annually by 7.00%, or the current annual percentage increase in the Consumer Price Index, whichever is less.

The Monthly Benefit payable will not be less than the Minimum Monthly Benefit shown in the Schedule of Benefits. However, if an overpayment is due to Liberty, the Minimum Monthly Benefit otherwise payable under this provision will be applied toward satisfying the overpayment.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Mental Illness and/or Substance Abuse Limitation**

The benefit for Disability due to Mental Illness and/or Substance Abuse will not exceed a combined period of 24 months of Monthly Benefit payments while the Covered Person is insured under this policy.

If the Covered Person is in a Hospital or Institution for Mental Illness and/or Substance Abuse at the end of the combined period of 24 months, the Monthly Benefit will be paid during the confinement.

If the Covered Person is not confined in a Hospital or Institution for Mental Illness and/or Substance Abuse, but is fully participating in an Extended Treatment Plan for the condition that caused Disability, the Monthly Benefit will be payable to a Covered Person for up to a combined period of 36 months.

In no event will the Monthly Benefit be payable beyond the Maximum Benefit Period shown in the Schedule of Benefits.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Rehabilitation Incentive Benefit**

Liberty will pay an increased Monthly Benefit while a Covered Person is fully participating in a Rehabilitation Program. Liberty must first approve the Rehabilitation Program in writing before a Covered Person can be considered for this benefit. If Liberty does not approve a Rehabilitation Program, the regular Disability benefit will be payable provided the Covered Person is Disabled under the terms of this policy. To be eligible for a Rehabilitation Incentive Benefit, the Covered Person must:

1. be Disabled and receiving benefits under this policy; and

2. be fully participating in a Rehabilitation Program approved by Liberty.

**Increased Monthly Benefit**

If the Covered Person is eligible for a Rehabilitation Incentive Benefit, the benefit percentage shown in the Schedule of Benefits, will be increased by 10.00%. The increased benefit will begin on the first day of the month after Liberty receives written Proof of the Covered Person's full participation in the Rehabilitation Program.

**Decreased Monthly Benefit**

If the Covered Person, at any time, declines to fully participate in an approved Rehabilitation Program recommended by Liberty, the benefit percentage shown in the Schedule of Benefits will be reduced by 10.00% beginning on the first day of the month following the Covered Person's declination to fully participate in the approved Rehabilitation Program. If Liberty recommends rehabilitation, benefits will be paid at the reduced amount from the date recommendation is made until Liberty receives the Covered Person's written agreement to fully participate in the Rehabilitation Program.

**Discontinuation of the Rehabilitation Incentive Benefit**

The Rehabilitation Incentive Benefit will cease:

1. when the Covered Person is no longer fully participating in a Rehabilitation Program approved by Liberty;

2. in accordance with the provision[s] entitled "Discontinuation of the Long Term Disability Benefit"; or

3. when the Rehabilitation Program ends.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Rehabilitation Incentive Benefit** (Continued)

For the purpose of this provision, **"Rehabilitation Program"** means a comprehensive individually tailored, goal oriented program to return a Disabled Covered Person to gainful employment. The services offered may include, but are not limited to, the following:

1. physical therapy;
2. occupational therapy;
3. work hardening programs;
4. functional capacity evaluations;
5. psychological and vocational counseling;
6. rehabilitative employment; and
7. vocational rehabilitation services.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Three Month Survivor Benefit**

Liberty will pay a lump sum benefit to the Eligible Survivor when Proof is received that a Covered Person died:

1. after Disability had continued for 180 or more consecutive days; and

2. while receiving a Monthly Benefit.

The lump sum benefit will be an amount equal to three times the Covered Person's Last Monthly Benefit.

If the survivor benefit is payable to the Covered Person's children, payment will be made in equal shares to the children, including step children and legally adopted children. However, if any of said children are minors or incapacitated, payment will be made on their behalf to the court appointed guardian of the children's property. This payment will be valid and effective against all claims by others representing or claiming to represent the children.

If there is no Eligible Survivor, the benefit is payable to the estate.

If an overpayment is due to Liberty at the time of a Covered Person's death, the benefit payable under this provision will be applied toward satisfying the overpayment.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Workplace Modification Benefit**

If a Covered Person is Disabled or Partially Disabled and receiving a benefit from Liberty, a benefit may be payable to the Sponsor as part of the Covered Person's benefit for modifications to the workplace to accommodate the Covered Person's return to work or to assist the Covered Person in remaining at work.

Liberty will reimburse the Sponsor for up to 100% of reasonable costs the Sponsor incurs for the modification, up to the greater of:

1. $2,000.00; or
2. the equivalent of 2 months of the Covered Person's Monthly Benefit.

To qualify for this benefit:

1. the Disability or Partial Disability must prevent the Covered Person from performing some or all of the Material and Substantial Duties of his occupation; and
2. any proposed modifications must be approved in writing and signed by the Covered Person, the Sponsor and Liberty; and
3. the Sponsor must agree to make the modifications to the workplace to reasonably accommodate the Covered Person's return to work or to assist the Covered Person in remaining at work.

The Sponsor's costs for the approved modifications will be reimbursed after:

1. the proposed modifications have been made; and
2. written proof of the expenses incurred by the Sponsor has been provided to Liberty; and
3. Liberty has received proof that the Covered Person has returned to and/or remains at work.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Other Income Benefits and Other Income Earnings**

**Other Income Benefits** means:

1. The amount for which the Covered Person is eligible under:

   a. Workers' or Workmen's Compensation Laws;
   b. Occupational Disease Law;
   c. Title 46, United States Code Section 688 (The Jones Act);
   d. any work loss provision in mandatory "No-Fault" auto insurance;
   e. Railroad Retirement Act;
   f. any governmental compulsory benefit act or law; or
   g. any other act or law of like intent.

2. The amount of any Disability benefits which the Covered Person is eligible to receive under:
   a. any other group insurance plan of the Sponsor;
   b. any governmental retirement system as a result of his employment with the Sponsor ; or
   c. any individual insurance plan where the premium is wholly or partially paid by the Sponsor. However, Liberty will only reduce the Monthly Benefit if the Covered Person's Monthly Benefit under this policy, plus any benefits that the Covered Person is eligible to receive under such individual insurance plan exceed 100% of the Covered Person's Basic Monthly Earnings. If this sum exceeds 100% of Basic Monthly Earnings, the Covered Person's Monthly Benefit under this policy will be reduced by such excess amount.

3. The amount of benefits the Covered Person receives under the Sponsor's Retirement Plan as follows:

   a. the amount of any Disability Benefits under a Retirement Plan, or Retirement Benefits under a Retirement Plan the Covered Person voluntarily elects to receive as retirement payment under the Sponsor's Retirement Plan; and
   b. the amount the Covered Person receives as retirement payments when he reaches the later of age 62, or normal retirement age as defined in the Sponsor's plan.

4. The amount of Disability and/or Retirement Benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or any similar plan or act, which:

   a. the Covered Person receives or is eligible to receive; and
   b. his spouse, child or children receives or are eligible to receive because of his Disability; or
   c. his spouse, child or children receives or are eligible to receive because of his eligibility for retirement benefits.

5. Any amount the Covered Person receives from any unemployment benefits.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Other Income Benefits and Other Income Earnings** (Continued)

**Other Income Earnings** means:

1. the amount of earnings the Covered Person earns or receives from any form of employment including severance; and

2. any amount the Covered Person receives from any formal or informal sick leave or salary continuation plan(s).

Other Income Benefits, except retirement benefits, must be payable as a result of the same Disability for which Liberty pays a benefit. The sum of Other Income Benefits and Other Income Earnings will be deducted in accordance with the provisions of this policy.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Estimation of Benefits**

Liberty will reduce the Covered Person's Disability or Partial Disability benefits by the amount of Other Income Benefits that we estimate are payable to the Covered Person and his dependents.

The Covered Person's Disability benefit will not be reduced by the estimated amount of Other Income Benefits if the Covered Person:

1. provides satisfactory proof of application for Other Income Benefits;

2. signs a reimbursement agreement under which, in part, the Covered Person agrees to repay Liberty for any overpayment resulting from the award or receipt of Other Income Benefits;

3. if applicable, provides satisfactory proof that all appeals for Other Income Benefits have been made on a timely basis to the highest administrative level unless Liberty determines that further appeals are not likely to succeed; and

4. if applicable, submits satisfactory proof that Other Income Benefits have been denied at the highest administrative level unless Liberty determines that further appeals are not likely to succeed.

Liberty will not estimate or reduce for any benefits under the Sponsor's pension or retirement benefit plan according to applicable law, until the Covered Person actually receives them.

In the event that Liberty overestimates the amount payable to the Covered Person from any plans referred to in the Other Income Benefits and Other Income Earnings provision of this policy, Liberty will reimburse the Covered Person for such amount upon receipt of written proof of the amount of Other Income Benefits awarded (whether by compromise, settlement, award or judgement) or denied (after appeal through the highest administrative level).

**Social Security Assistance**

Liberty may help a Covered Person in applying for Social Security Disability Income Benefits. In order to be eligible for assistance the Covered Person must be receiving a Monthly Benefit from Liberty. Such assistance will be provided only if Liberty determines that assistance would be beneficial.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Lump Sum Payments**

Other Income Benefits from a compromise, settlement, award or judgement which are paid to the Covered Person in a lump sum and are meant to compensate the Covered Person for any one or more of the following:

1. loss of past or future wages;
2. impaired earnings capacity;
3. lessened ability to compete in the open labor market;
4. any degree of permanent impairment; and
5. any degree of loss of bodily function or capacity;

will be prorated on a monthly basis as follows:

1. over the period of time such benefits would have been paid if not in a lump sum; or

2. if such period of time cannot be determined, the lesser of:

    a. the remainder of the Maximum Benefit Period; or
    b. 5 years.

**Cost of Living Freeze**

After the first deduction for each of the Other Income Benefits, the Monthly Benefit will not be further reduced due to any cost of living increases payable under the Other Income Benefits and Other Income Earnings provision of this policy. This provision does not apply to increases received from any form of employment.

**Prorated Benefits**

For any period for which a Long Term Disability benefit is payable that does not extend through a full month, the benefit will be paid on a prorated basis. The rate will be 1/30th for each day for such period of Disability.

**Discontinuation of the Long Term Disability Benefit**

The Monthly Benefit will cease on the earliest of:

1. the date the Covered Person fails to provide Proof of continued Disability or Partial Disability and Regular Attendance of a Physician;

2. the date the Covered Person fails to cooperate in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Discontinuation of the Long Term Disability Benefit** (Continued)

The Monthly Benefit will cease on the earliest of: (Continued)

3. the date the Covered Person refuses to be examined or evaluated at reasonable intervals;

4. the date the Covered Person refuses to receive Appropriate Available Treatment;

5. the date the Covered Person refuses a job with the Sponsor where workplace modifications or accommodations were made to allow the Covered Person to perform the Material and Substantial Duties of the job;

6. the date the Covered Person is able to work in his Own Occupation on a part-time basis, but chooses not to;

7. the date the Covered Person's current Partial Disability earnings exceed 80.00% of his Indexed Basic Monthly Earnings;

   Because the Covered Person's current earnings may fluctuate, Liberty will average earnings over three consecutive months rather than immediately terminating his benefit once 80.00% of Indexed Basic Monthly Earnings has been exceeded.

8. the date the Covered Person is no longer Disabled according to this policy;

9. the end of the Maximum Benefit Period; or

10. the date the Covered Person dies.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Successive Periods of Disability**

With respect to this policy, **"Successive Periods of Disability"** means a Disability which is related or due to the same cause(s) as a prior Disability for which a Monthly Benefit was payable.

A Successive Period of Disability will be treated as part of the prior Disability if, after receiving Disability benefits under this policy, a Covered Person:

1. returns to his Own Occupation on an Active Employment basis for less than six continuous months; and

2. performs all the Material and Substantial Duties of his Own Occupation.

To qualify for a Successive Periods of Disability benefit, the Covered Person must experience more than a 20% loss of Basic Monthly Earnings.

Benefit payments will be subject to the terms of this policy for the prior Disability.

If a Covered Person returns to his Own Occupation on an Active Employment basis for six continuous months or more, the Successive Period of Disability will be treated as a new period of Disability. The Covered Person must complete another Elimination Period.

If a Covered Person becomes eligible for coverage under any other group long term disability coverage, this Successive Period of Disability provision will cease to apply to that Covered Person.

# SECTION 5 - EXCLUSIONS

## GENERAL EXCLUSIONS

This policy will not cover any Disability due to:

1. war, declared or undeclared, or any act of war;
2. intentionally self-inflicted injuries, while sane or insane;
3. active Participation in a Riot;
4. the committing of or attempting to commit a felony or misdemeanor;
5. cosmetic surgery unless such surgery is in connection with an Injury or Sickness sustained while the individual is a Covered Person; or
6. a gender change, including, but not limited to, any operation, drug therapy or any other procedure related to a gender change.

No benefit will be payable during any period of incarceration.

With respect to this provision, **Participation** shall include promoting, inciting, conspiring to promote or incite, aiding, abetting, and all forms of taking part in, but shall not include actions taken in defense of public or private property, or actions taken in defense of the Covered Person, if such actions of defense are not taken against persons seeking to maintain or restore law and order including, but not limited to police officers and fire fighters.

With respect to this provision, **Riot** shall include all forms of public violence, disorder or disturbance of the public peace, by three or more persons assembled together, whether or not acting with a common intent and whether or not damage to persons or property or unlawful act or acts is the intent or the consequence of such disorder.

## SECTION 5 - EXCLUSIONS
(Continued)

**LONG TERM DISABILITY COVERAGE**

**Pre-Existing Condition Exclusion**

This policy will not cover any Disability or Partial Disability:

1. which is caused or contributed to by, or results from, a Pre-Existing Condition; and
2. which begins in the first 12 months immediately after the Covered Person's effective date of coverage.

**"Pre-Existing Condition"** means a condition resulting from an Injury or Sickness for which the Covered Person is diagnosed or received Treatment within three months prior to the Covered Person's effective date of coverage.

# SECTION 6 - TERMINATION PROVISIONS

**Termination of a Covered Person's Insurance**

A Covered Person will cease to be insured on the earliest of the following dates:

1. the date this policy terminates, but without prejudice to any claim originating prior to the time of termination;

2. the date the Covered Person is no longer in an eligible class;

3. the date the Covered Person's class is no longer included for insurance;

4. the date employment terminates. Cessation of Active Employment will be deemed termination of employment, except the insurance will be continued for an Employee absent due to Disability during:

   a. the Elimination Period; and
   b. any period during which premium is being waived.

5. the date the Covered Person ceases active work due to a labor dispute, including any strike, work slowdown, or lockout.

Liberty reserves the right to review and terminate all classes insured under this policy if any class(es) cease(s) to be covered.

## SECTION 6 - TERMINATION PROVISIONS
(Continued)

**Policy Termination**

1. Termination of this policy under any conditions will not prejudice any claim which occurs while this policy is in force.

2. If the Sponsor fails to pay any premium within the grace period, this policy will terminate at 12:00 midnight Standard Time on the last day of the grace period. The Sponsor may terminate this policy by advance written notice delivered to Liberty at least 31 days prior to the termination date. This policy will not terminate during any period for which premium has been paid. The Sponsor will be liable to Liberty for all premiums due and unpaid for the full period for which this policy is in force.

3. Liberty may terminate this policy on any premium due date by giving written notice to the Sponsor at least 31 days in advance if:

   a. the number of Employees insured is fewer than 10; or

   b. less than 100.00% of all the Employees eligible for any non-contributory insurance are insured for it; or

   c. the Sponsor fails:

      i. to furnish promptly any information which Liberty may reasonably require; or
      ii. to perform any other obligations pertaining to this policy.

4. Liberty may terminate this policy or any coverage(s) afforded hereunder and for any class of covered Employees on any premium due date after it has been in force for 12 months. Liberty will provide written notice of such termination to the Sponsor at least 31 days before the termination is effective.

5. Termination may take effect on an earlier date if agreed to by the Sponsor and Liberty.

# SECTION 7 - GENERAL PROVISIONS

**Assignment**

No assignment of any present or future right or benefit under this policy will be allowed.

**Complete Contract - Policy Changes**

1. This policy is the entire contract. It consists of:

   a. all of the pages; and
   b. the attached signed Application of the Sponsor.

2. This policy may be changed in whole or in part. Only an officer of Liberty can approve a change. The approval must be in writing and endorsed on or attached to this policy.

3. No other person, including an agent, may change this policy or waive any part of it.

**Conformity with State Statutes**

Any provision of this policy which, on its effective date, is in conflict with the statutes of the governing jurisdiction of this policy is hereby amended to conform to the minimum requirements of such statute.

**Employee's Certificate**

Liberty will provide a Certificate to the Sponsor for delivery to Covered Persons. It will state:

1. the name of the insurance company and the policy number;
2. a description of the insurance provided;
3. the method used to determine the amount of benefits;
4. to whom benefits are payable;
5. limitations or reductions that may apply;
6. the circumstances under which insurance terminates; and
7. the rights of the Covered Person upon termination of this policy.

If the terms of a Certificate and this policy differ, this policy will govern.

**Examination**

Liberty, at its own expense, may have the right and opportunity to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by Liberty. This right may be used as often as reasonably required.

## SECTION 7 - GENERAL PROVISIONS
(Continued)

**Furnishing of Information - Access to Records**

1. The Sponsor will furnish at regular intervals to Liberty:

   a. information relative to Employees:

      i. who qualify to become insured;
      ii. whose amounts of insurance change; and/or
      iii. whose insurance terminates.

   b. any other information about this policy that may be reasonably required.

   The Sponsor's records which, in the opinion of Liberty, have a bearing on the insurance will be opened for inspection at any reasonable time.

2. Clerical error or omission will not:

   a. deprive an Employee of insurance;
   b. affect an Employee's Amount of Insurance; or
   c. effect or continue an Employee's insurance which otherwise would not be in force.

**Interpretation of the Policy**

Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

**Incontestability**

The validity of this policy shall not be contested, except for non-payment of premiums, after it has been in force for two years from the date of issue. The validity of this policy shall not be contested on the basis of a statement made relating to insurability by any person covered under this policy after such insurance has been in force for two years during such person's lifetime, and shall not be contested unless the statement is contained in a written instrument signed by the person making such statement.

**Legal Proceedings**

A claimant or the claimant's authorized representative cannot start any legal action:

1. until 60 days after Proof of claim has been given; or

2. more than one year after the time Proof of claim is required.

## SECTION 7 - GENERAL PROVISIONS
(Continued)

**Misstatement of Age**

If a Covered Person's age has been misstated, an equitable adjustment will be made in the premium. If the amount of the benefit is dependent upon an Employee's age, the amount of the benefit will be the amount an Employee would have been entitled to if his correct age were known.

A refund of premium will not be made for a period more than 12 months before the date Liberty is advised of the error.

**Notice and Proof of Claim**

1. **Notice**

   a. Notice of claim must be given to Liberty within 30 days of the date of the loss on which the claim is based. If that is not possible, Liberty must be notified as soon as it is reasonably possible to do so. Such notice of claim must be received in a form or format satisfactory to Liberty.

   b. When written notice of claim is applicable and has been received by Liberty, the Covered Person will be sent claim forms. If the forms are not received within 15 days after written notice of claim is sent, the Covered Person can send to Liberty written Proof of claim without waiting for the forms.

2. **Proof**

   a. Satisfactory Proof of loss must be given to Liberty no later than 30 days after the end of the Elimination Period.

   b. Failure to furnish such Proof within such time shall not invalidate or reduce any claim if it was not reasonably possible to furnish such Proof within such time. Such Proof must be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than one year from the time Proof is otherwise required.

   c. Proof of continued loss, continued Disability or Partial Disability, when applicable, and Regular Attendance of a Physician must be given to Liberty within 30 days of the request for such Proof.

Liberty reserves the right to determine if the Covered Person's Proof of loss is satisfactory.

**Payment of Claims**

The benefit is payable to the Covered Person. But, if a benefit is payable to a Covered Person's estate, a Covered Person who is a minor, or who is not competent, Liberty has the right to pay up to $2,000 to any of the Covered Person's relatives or any other person whom Liberty considers entitled thereto by reason of having incurred expense for the maintenance, medical attendance or burial of the Covered Person. If Liberty in good faith pays the benefit in such a manner, any such payment shall fulfill Liberty's responsibility for the amount paid.

## SECTION 7 - GENERAL PROVISIONS
(Continued)

**Right of Recovery**

Liberty has the right to recover any overpayment of benefits caused by, but not limited to, the following:

1. fraud;
2. any error made by Liberty in processing a claim; or
3. the Covered Person's receipt of any Other Income Benefits.

Liberty may recover an overpayment by, but not limited to, the following:

1. requesting a lump sum payment of the overpaid amount;
2. reducing any benefits payable under this policy;
3. taking any appropriate collection activity available including any legal action needed; and
4. placing a lien, if not prohibited by law, in the amount of the overpayment on the proceeds of any Other Income Benefits, whether on a periodic or lump sum basis.

It is required that full reimbursement be made to Liberty.

**Statements**

In the absence of fraud, all statements made in any application are considered representations and not warranties (absolute guarantees). No representation by:

1. the Sponsor in applying for this policy will make it void unless the representation is contained in the signed Application; or

2. any Employee in enrolling for insurance under this policy will be used to reduce or deny a claim unless a copy of the Enrollment Form, signed by the Employee if required, is or has been given to the Employee.

**Subrogation and Reimbursement**

When a Covered Person's Injury or Sickness appears to be someone else's fault, benefits otherwise payable under this policy for loss of time as a result of that Injury or Sickness will not be paid unless the Covered Person or his legal representative agree(s):

1. to repay Liberty for such benefits to the extent they are for losses for which compensation is paid to the Covered Person by or on behalf of the person at fault;

2. to allow Liberty a lien on such compensation and to hold such compensation in trust for Liberty; and

3. to execute and give to Liberty any instruments needed to secure the rights under 1. and 2. above.

Further, when Liberty has paid benefits to or on behalf of the injured Covered Person, Liberty will be subrogated to all rights of recovery that the Covered Person has against the person at fault. These subrogation rights will extend only to recovery of the amount Liberty has paid. The Covered Person must execute and deliver any instruments needed and do whatever else is necessary to secure those rights to Liberty.

## SECTION 7 - GENERAL PROVISIONS
(Continued)

**Workers' Compensation**

This policy and the coverages provided are not in lieu of, nor will they affect any requirements for coverage under any Workers' Compensation Law or other similar law.

# SECTION 8 - PREMIUMS

**Premium Rates**

Liberty has set the premiums that apply to the coverage(s) provided under this policy. Those premiums are shown in a notice given to the Sponsor with or prior to delivery of this policy.

A change in the initial premium rate(s) will not take effect within the first 3 years except that Liberty may change premium rates at any time for reasons which affect the risk assumed, including those reasons shown below:

1. a change occurs in the policy design;
2. a division, subsidiary or Associated Company is added to or deleted from this policy;
3. when the number of Covered Persons changes by 15.00% or more from the number insured on this policy's effective date; or
4. a change in existing law which affects this policy.

No premium may be changed unless Liberty notifies the Sponsor at least 31 days in advance. Premium changes may take effect on an earlier date when both Liberty and the Sponsor agree.

**Payment of Premiums**

1. All premiums due under this policy, including adjustments, if any, are payable by the Sponsor on or before their due dates at Liberty's Administrative Office, or to Liberty's agent. The due dates are specified on the first page of this policy.
2. All payments made to or by Liberty shall be in United States dollars.
3. If premiums are payable on a monthly basis, premiums for additional or increased insurance becoming effective during a policy month will be charged from the next premium due date.
4. The premium charge for insurance terminated during a policy month will cease at the end of the policy month in which such insurance terminates. This manner of charging premium is for accounting purposes only. It will not extend insurance coverage beyond a date it would have otherwise terminated as shown in the "Termination of a Covered Person's Insurance" provision of this policy.
5. If premiums are payable on other than a monthly basis, premiums for additional, increased, reduced or terminated insurance will cause a prorated adjustment on the next premium due date.
6. Except for fraud and premium adjustments, refunds of premiums or charges will be made only for:
    1. the current policy year; and
    2. the immediately preceding policy year.

## SECTION 8 - PREMIUMS
(Continued)

**Grace Period**

This is the 31 days following a premium due date, other than the first, during which premium payment may be made. During the grace period this policy shall continue in force, unless the Sponsor has given Liberty written notice 31 days in advance of discontinuance of this policy.

**Waiver of Premium**

Premium payments for a Covered Person are waived during any period for which benefits are payable. If coverage is to be continued, premium payments must be resumed following a period during which they were waived.

# AMENDMENT NO. 1

It is agreed the following changes are hereby made to this policy: GF3-840-444153-01

| Changes | Additions | Deletions |
|---|---|---|
| Added 3 Associated Companies to the Policy. | Form ADOP-SCH-1 R (1)<br>Form ADOP-ELG-8 R (1) | Form ADOP-SCH-1<br>Form ADOP-ELG-8 |

The effective date of this change is January 1, 2014.

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This policy's terms and provisions will apply other than as stated in this amendment.

Dated this 1st day of April, 2014.

Issued to and Accepted by:

Acxiom Corporation
**Sponsor**

By ______________________________
**Signature and Title of Officer**

**Liberty Life Assurance Company of Boston**



# AMENDMENT NO. 2

It is agreed the following changes are hereby made to this policy: GF3-840-444153-01

| Changes | Additions | Deletions |
|---|---|---|
| Added an Associated Company to the Policy | Form ADOP-SCH-1 R (2) | Form ADOP-SCH-1 R (1) |

The effective date of this change is January 1, 2015.

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This policy's terms and provisions will apply other than as stated in this amendment.

Dated this 23rd day of February, 2015.

Issued to and Accepted by:

Acxiom Corporation
**Sponsor**

By ______________________________
**Signature and Title of Officer**

**Liberty Life Assurance Company of Boston**

Stephen J. McAnena

Liberty Mutual.
INSURANCE

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 430-1942

May 10, 2018

Daniel A. Webb
425 WEST CAPITOL AVENUE
SUITE 1586
LITTLE ROCK, AR 72201

EXHIBIT
B

RE: Long Term Disability (LTD) Benefits
Acxiom Corporation
Claim #: 5716432
Claimant: Shane Keathley

Dear Mr. Webb:

We reviewed your client's appeal request for Long Term Disability ("LTD") benefits and maintained the decision to deny benefits beyond November 7, 2017.

**Initial Claim Decision**

Mr. Keathley submitted a claim for his absence from work beginning December 2, 2015 following surgery to implant an ICD. LTD benefits were approved from June 1, 2016 through November 7, 2017. Benefits beyond November 7, 2017 were denied as the evaluation concluded Mr. Keathley was no longer disabled as defined by the Policy.

The basis for the decision was outlined in a letter dated November 7, 2017. Mr. Keathley was provided an opportunity to request an appeal review of the denial, stating the reasons why he felt his claim should not have been denied, and submit additional information to support the claim. Specifically, Mr. Keathley was advised to submit the following information: all treatment notes, diagnostic tests, radiology results, operative and procedure reports from all providers including Dr. Cilingiroglu and any provider who treated him from December, 2015 through the present that had not already been submitted for review; physician documentation to support the specific restrictions and limitations given by his providers, including an explanation of how they preclude Mr. Keathley from performing the substantial and material duties of his own occupation; therapy notes, medications prescribed and filled; hospitalization records; as well as any additional information which he felt would support his claim. The medical documentation should clearly show impairment from a physical or psychiatric illness precluded him from performing the duties of any occupation with respect to medically supported restrictions and limitations.

**Appeal**

In your letter of appeal dated April 4, 2018, you requested an appeal review of Mr. Keathley's denied LTD claim. You noted Mr. Keathley suffered from coronary artery disease, ischemic cardiomyopathy, obstructive sleep apnea, anxiety/depression, hyperlipemia, and hypertension.

You noted Dr. Cilingiroglu diagnosed Mr. Keathley with Congestive Heart Failure New York Heart Association Class III. Mr. Keathley may only sit and stand/walk a total of less than 2 hours in an 8 hour work day and "cannot work" in a competitive work situation.

You noted Mr. Keathley's prescription records demonstrated he was receiving ongoing treatment for not only heart issues, but depression/anxiety, a condition that should not surprise anyone given Mr. Keathley's heart condition. He also has sleep apnea.

You noted Bob White, a vocational expert stated Mr. Keathley was unable to work.

In support of Mr. Keathley's claim, you submitted the following information:

- November 10, 2017 letter of Mehmet Cilingiroglu, MD, FESC, FSCAI, FACC
- Cardiac Medical Source Statement, January 10, 2018, Dr. Cilingiroglu
- May 3, 2017, July 12, 2017, January 10, 2018, February 23, 2018 treatment notes of Dr. Cilingiroglu
- October 24, 2017 treatment notes of Scott Beau, MD
- September 13, 2017 treatment notes of Patrick Stage, APN
- Vocational Evaluation of Robert W. White, MSE, Vocational Specialist, February 26, 2018
- Affidavit of Shane Keathley March 26, 2018

**Appeal Evaluation**

During the claim evaluation for ongoing benefits, Mr. Keathley's claim was reviewed by a consulting physician board certified in cardiovascular disease, nuclear cardiology and echocardiography. This review noted Mr. Keathley was a 43-year-old gentleman with a history of coronary artery disease with a myocardial infarction in 2014 requiring PCI of the LAD and subsequent PCI of the right coronary artery. He had a fluctuating ejection fraction but ultimately was measured consistently in the 20-30% range and he underwent a biventricular ICD implant. The medical records over the last 6 months varied in describing his functional capacity. He was evaluated for an experimental left ventricular device in February at which time he was described as New York Heart Association class I, Canadian class 0 and had a 6 minute walk test achieving 1522 feet. He was not felt to be a candidate for the device because of his good functional capacity. He was placed on a diuretic for the first time in April because of occasional swelling. A follow-up cardiac catheterization after his interventions has shown non obstructive disease.

The consulting cardiologist concluded Mr. Keathley's impairing diagnosis was ischemic cardiomyopathy. Telephone contact was made with Dr. Mehmet Cilingiroglu on June 1, 2016 and again on October 19, 2017. Dr. Cilingiroglu indicated Mr. Keathley could safely attempt to return to full-time sedentary type employment described as: occasionally lifting up to 10 pounds, occasional standing and walking short distances and unlimited sitting. The ideal employment would be that in a desk job with occasional bending/kneeling/squatting and pulling/pulling up to 10 pounds of force. There was no limitation in terms of keyboarding. The medical records supported this opinion.

The consulting physician noted Mr. Keathley had a severe cardiomyopathy but was clinically in

New York Heart Association class I indicating that he had no symptoms of congestive heart failure despite the severity of his underlying disorder. He was recently evaluated for an experimental device and had good exercise tolerance on a 6 minute walk test which corroborated his good exercise tolerance. In this setting it was safe for Mr. Keathley to return to sedentary type capacity. As he has a relatively fixed cardiac output, it was unlikely he would be able to tolerate physical activity above a sedentary level. Indeed, as was acknowledged by his cardiologist during our telephone call, the severity of his underlying cardiomyopathy may not allow him the stamina for full-time employment, but it was certainly safe for him to attempt this. His restrictions could be considered permanent.

Mr. Keathley's claim was previously reviewed by a vocational consultant, who completed an occupational analysis to identify the material and substantial duties of Mr. Keathley's occupation as it is normally performed in the national economy. The analysis showed the job tasks of Mr. Keathley's job as a Senior TL of Engineering fell under the DOT code of Software Engineer (DOT: 030.062-010) and SOC/O*NET classification of Software Developers, Applications (SOC # 15-1132.00). The occupation falls under the Occupational Outlook Handbook (OOH) description of Software Developers.

Based upon the research as outlined above, the vocational consultant concluded this occupation was performed at the sedentary level of physical demand levels in the national economy. The Department of Labor defines sedentary work as:

> *Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists form 1/3 to 2/3 of the time) to lift, carry, push, pull or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief amounts of time. Jobs are sedentary if walking or standing are required only occasionally and all other sedentary criteria are met.*

**Positional Requirements:**

- Frequent: sitting, fingering
- Occasional: reaching, handling, standing, walking
- No: bending/stooping, crouching/squatting, twisting, climbing, crawling, kneeling or balancing

The disability case manager concluded based on the supported restrictions and limitations and the occupational duties of a Software Engineer that Mr. Keathley was no longer Disabled as defined by the Policy.

During the review of Mr. Keathley's appeal, his claim was reviewed by Rizwan A. Karatela, M.D., an independent physician board certified in cardiovascular disease. Based on his review of the medical records, Dr. Karatela concluded the medical documentation did support diagnoses causing functional impairment from November 7, 2017 to the present. The functional impairment was supported for sedentary work.

Dr. Karatela noted the following restrictions applied to the diagnoses of coronary artery disease (CAD), acute ST elevation myocardial infarction (STEMI), ischemic cardiomyopathy, chronic systolic heart failure with reduced LV ejection fraction and Automatic Implantable Cardioverter Defibrillator (AICD) implantation. Mr. Keathley has symptoms of reduced exercise tolerance and

dyspnea and this would make performing light work unlikely where he would need to perform prolonged standing/walking. In all likelihood, he is probably only capable of performing sedentary work. Mr. Keathley can perform sustained full time sedentary level work capacity with the following restrictions and limitations: lift, carry, and push/pull up to 10 pounds occasionally. Sitting for up to 60 minutes at one time then needing a 10 minute break for position change prior to resuming sitting activities for a total of 6 hours in an 8 hour day. Stand and walk up to 20 minutes at one time; each activity, then needing a 10 minute break for position change prior to resuming stand/walk activities for a total of 2 hours combined in an 8 hour day. No restrictions with repetitive hand movement and keyboarding.

Due to the present of Automatic Implantable Cardioverter Defibrillator (AICD) Mr. Keathley is restricted from climbing ladders, driving commercial vehicle or operate heavy machinery.

Relative to the timeframes of November 7, 2017 to the present, Dr. Karatela indicated the medical records did not indicate any reported or observed cognitive and/or physical side effects attributed to Mr. Keathley's medications.

There was noted to be minor feeling of tiredness and fatigued due to Carvedilol reported which was ratified by reducing the dosage and reportedly it was resolved. This is a common occurrence and was appropriately resolved. Besides that there was no other documentation of medication side effects.

Dr. Karatela noted the medical documentation did not support that any medical condition alone, or in combination would preclude Mr. Keathley from sustained occupational functioning on a full-time basis at a sedentary level.

He noted Mr. Keathley was a 45 year old male with past medical history significant for coronary artery disease (CAD). Mr. Keathley presented with acute myocardial infarction on January 12, 2014. He underwent successful percutaneous coronary intervention (PCI) of left anterior descending artery (LAD) on with drug eluting stenting (DES). He was noted to have reduced LV systolic function as result of acute myocardial infarction.

Since his myocardial infarction Mr. Keathley has been closely followed by his cardiologists. About 5 months later (May 2014) he had another intervention which he had his right coronary artery (RCA) stenting. No reported repeated myocardial infarction.

Subsequently he was left with ischemic Cardiomyopathy (ICM) with reduced ejection fraction 25-30% complain of fatigue, tiredness and decreased capacity. In 2014 and 2015 his ejection fraction improved and reportedly was able to return to work. In 2015 his ejection fraction remained persistent low and required Automatic Implantable Cardioverter Defibrillator (AICD) on December 2, 2015.

The following observation from the medical records indicated to Dr. Karatela that while Mr. Keathley had significant history of coronary artery disease (CAD) and ischemic cardiomyopathy his course from July 2017 has been stable.

On July 12, 2017, Mr. Keathley was seen by Dr. Cilingiroglu (cardiology) in office follow up from his recent hospitalization for chest pain. He reported he had normal Pro BNP. His last

echocardiogram showed mildly reduced LVEF of 45-50% with moderately increased LV cavity. During the hospitalization he was found to have LVEF of 40% with patent proximal LAD stent with mid 30% stenosis, mid RCA 30%, and patent distal RCA stent. Dr. Cilingiroglu said "Seems to be doing well with no angina since that night". His BP was noted 122/80 mmHg, and the cardiac examination was reported within normal limits. He was advised to continue his medication and follow up in 6 months.

On September 13, 2017, Mr. Keathley was seen by Patrick Stage, APN (cardiology) in office follow up. Reportedly no chest pain, no syncope. ICD interrogation done in office. On examination BP was 117/80 mmHg, the cardiac examination was reported within normal limits. Noted CHF with NYHA functional Class III but no JVD and no edema noted and lung clear. No objective information to collaborate class III congestive heart failure (CHF) in the note. Follow up visit in 3 months. The objective data does not correlated with class III CHF.

Note by definition; NYHA functional Class III. Patients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea, or anginal pain.

On October 19, 2017, a correspondence letter from Dr. Robert Morrison, consulting physician to Dr. Mehmet Cilingiroglu was noted, "As we discussed, you indicated that Mr. Keathley's restrictions and limitations in a full time occupational capacity remain unchanged from our conversation in June of 2016. Specifically you indicated that he could safely attempt to return to full-time sedentary type employment described as: occasionally lifting up to 10 pounds, occasional standing and walking short distances and unlimited sitting. The ideal employment would be that in a desk job with occasional bending/kneeling/squatting and pulling/pulling up to 10 pounds of force. There is no limitation in terms of keyboarding".

On November 10, 2017, a letter by cardiologist, Dr. Mehmet Cilingiroglu, indicated, "has history of massive anterior myocardial infarction s/p multiple PCI's, severe cardiomyopathy with LBBB, eventually requiring Bi-V AICD implantation. He continues to be disabled. He cannot and should not be in a stressful environment".

On December 24, 2017, Mr. Keathley was seen by Dr. Scott Beau in cardiology for cardiomyopathy, congestive heart failure (CHF) and ICD follow up. Noted to have "some positional chest pain not consistent with angina". The blood pressure was 127/29, and pain scale 0 (1-10 scale). The cardiac examination was reported within normal limits. Follow up in 3 months. No changes noted. No reported decompensated congestive heart failure (CHF).

On January 10, 2018, Mr. Keathley was seen by Dr. Cilingiroglu (cardiology) in office follow up he noted Mr. Keathley comes in for follow up. He has CAD s/p PCI and MI. Also has ischemic CM with AICD. He has been at times sleepy and not doing much. No angina. Still has significant fatigue at rest as well as with minimal exercise. We recommended for him to reconnect with our cardiac rehab program for healthier lifestyle. Consulted him about weight loss and healthy eating. Trying to get his long term disability. The examination reported his BP of 128/82 mmHg, the pulse of 80 bpm, his weight was 227 pounds, and the Oxygen saturation of 95%. His cardiac examination reported normal. Specifically there was no signs of volume overload with no jugular vein distention, lung reported clear and no lower extremities edema reported. His medical therapy was continued without much change and he was advised to follow up in 6 months.

Dr. Karatela found no objective data to indicate something changed from October 2017. Medical information did not contain enough objective data such as disabling symptoms, limitations, or abnormal exam findings or abnormal cardiac testing that would suggest significant cardiac impairment precluding him from sedentary level work. The medical records provided no evidence of acute congestive heart failure (CHF) requiring hospitalization, myocardial infarction or significant arrhythmia that would indicate that Mr. Keathley had any acute cardiac event that prevented him from working. Therefore. the clinical information does not support functional impairment from cardiology perspective during the periods of time in question that he cannot do sedentary level work as noted above.

Dr. Karatela was asked if he agreed with Dr. Cilingiroglu's assessment of NYHA Class III designation and that Mr. Keathley was unable to work. Dr. Karatela indicated Dr. Mehmet Cilingiroglu has noted Mr. Keathley with a diagnoses of CHF and a NYHA Class III designation and as a result cannot work. While at the time of his initial myocardial infarction (January 2014) and several months afterwards he was characterized as CHF class III, but for the review period in question Dr. Karatela did not agree with this assessment for the following reasons outlined above.

On January 10, 2018 Mr. Keathley was seen by Dr. Cilingiroglu (cardiology) in office follow up he noted "comes in for follow up." He has CAD status post PCI and MI. Also has ischemic CM with AICD. He has been at times sleepy and not doing much. No angina. Still has significant fatigue at rest as well as with minimal exercise. We recommended for him to reconnect with our cardiac rehab program for healthier lifestyle. Consulted him about weight loss and healthy eating. Trying to get his long term disability. The examination reported his BP of 128/82 mmHg, the pulse of 80 bpm, his weight was 227 pounds, and the Oxygen saturation of 95%. His cardiac examination reported normal. Specifically there was no signs of volume overload with no jugular vein distention, lung reported clear and no lower extremities edema reported. His medical therapy was continued without much changes and he was advised to follow up in 6 months.

Briefly, noted CHF with NYHA functional Class III but no JVD and no edema noted and lung clear. No objective information to collaborate class III congestive heart failure (CHF) in the note. The objective data does not correlated with class III CHF. Follow up visit in 6 months suggested fairly stable congestive heart failure (CHF) with no intensified follow up required most likely not Class III but probably Class II, based on the noted Dr. Karatela reviewed.

Note by definition; NYHA functional Class III. Patients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea, or anginal pain. There is no indication in the notes to suggest that Mr. Keathley has this.

The appeal review concludes the medical evidence supports Mr. Keathley is impaired by his diagnoses of coronary artery disease (CAD), acute ST elevation myocardial infarction (STEMI), ischemic cardiomyopathy, chronic systolic heart failure with reduced LV ejection fraction and Automatic Implantable Cardioverter Defibrillator (AICD) implantation. Mr. Keathley has symptoms of reduced exercise tolerance and dyspnea and this would make performing light work unlikely where he would need to perform prolonged standing/walking. The medical evidence supports reasonable restrictions and limitations of lift, carry, and push/pull up to 10 pounds occasionally. Sitting for up to 60 minutes at one time then needing a 10 minute break for position change prior to

resuming sitting activities for a total of 6 hours in an 8 hour day. Stand and walk up to 20 minutes at one time; each activity, then needing a 10 minute break for position change prior to resuming stand/walk activities for a total of 2 hours combined in an 8 hour day. No restrictions with repetitive hand movement and keyboarding.

We disagree with Dr. Cilingiroglu's assessment of NYHA Class III designation and that Mr. Keathley was unable to work because the medical evidence does not indicate JVD and no edema noted and lung clear. No objective information was documented to collaborate class III congestive heart failure (CHF) in the notes. Follow up visit in 6 months suggested fairly stable congestive heart failure (CHF) with no intensified follow up required.

The clinical evidence does not support the conclusion that job related stress would exacerbated Mr. Keathley's health conditions or that a return to his prior occupation would be dangerous to his health from a cardiovascular perspective.

Based on the clinical literature, there is no definitive evidence that return to work in a specific case would exacerbate the progression of cardiovascular disease or that restriction from work would necessarily ameliorate progression of disease or reduce the risk of recurrent adverse cardiovascular events. There is some evidence that cardiac rehabilitation programs including stress reduction interventions may be beneficial, although results of these trials have been variable; there have been no controlled trials pertaining specifically to work stoppage. Therefore, the restrictions and limitations outlined by the physician peer reviewers remain reasonable and are within the functional demand level for Mr. Keathley's occupation.

We acknowledge Mr. Keathley has been approved for Social Security Disability benefits, however, determinations made by Liberty Life Assurance Company of Boston are based on the provisions outlined in Acxicom Corporation's Policy. These provisions are not contingent on decisions made by either the Social Security Administration or other disability-determining entities. Therefore, an award of Social Security Disability Benefits is not determinative of entitlement to benefits under the specific terms and conditions of the Group Disability Income Policy.

In our review of Mr. Keathley's claim, we fully considered the totality of all medical and vocational documentation received; including updated medical records dated after Mr. Keathley's Social Security Notice of Award dated April 17, 2016.

Furthermore, we obtained updated medical records and reviews by medical experts based on the claim file documentation that was in Mr. Keathley's file and provided on appeal. This current information has not been considered by the Social Security Administration in its determination process.

Our role in reviewing Mr. Keathley's file is to determine whether his medical condition and the medical documentation contained in the file supports that he was unable to perform the material and substantial duties of his own occupation beyond November 7, 2017. Our review concludes the medical evidence and claim file documentation does not support Disability beyond that date.

**Conclusion**

We conducted a thorough and independent review of the entire claim. We Mr. Keathley continued to

experience symptoms associated with his condition beyond November 7, 2017 that are impairing. However, the information does not contain exam findings, diagnostic test results or other medical documentation supporting Mr. Keathley's symptoms remained of such severity, frequency and duration that they resulted in restrictions or limitations rendering him unable to perform the duties of his occupation after that date.

Having carefully considered all of the information submitted in support of your claim, our position remains that Proof of continued disability in accordance with the Policy provisions after November 7, 2017 has not been provided. Therefore, no further benefits are payable.

This claim decision reflects an evaluation of the claim facts and Policy provisions.

**Policy Provisions**

To continue receiving benefits, you must satisfy the requirements of all Policy provisions that state, in part:

*"**Disability**" or "**Disabled**" means:*

1. *For persons other than pilots, co-pilots, and crewmembers of an aircraft:*
   i. *that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and*

*"**Material and Substantial Duties**" means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.*

*"**Own Occupation**" means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy.*

*"**Proof**" means the evidence in support of a claim for benefits and includes, but is not limited to, the following:*

1. *a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;*
2. *an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and*
3. *the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.*

*Proof must be submitted in a form or format satisfactory to Liberty.*

***Discontinuation of the Long Term Disability Benefit***
*The Monthly Benefit will cease on the earliest of:*

8. *the date the Covered Person is no longer Disabled according to this policy;*

The Policy also states the following regarding legal proceedings:

> ***Legal Proceedings***
> *A claimant or the claimant's authorized representative cannot start any legal action:*
> 1. *until 60 days after Proof of claim has been given; or*
> 2. *more than one year after the time Proof of claim is required.*

For purposes of this claim, the time proof of claim is required is based on the date of the denial letter, November 7, 2017. The contractual statute of limitations period under the Legal Proceedings provision would begin on November 7, 2017 and will expire on November 7, 2018.

Under the Employee Retirement Income Security Act (ERISA) appeal guidelines, Mr. Keathley was entitled to appeal the decision made by Liberty Life Assurance Company of Boston (Liberty), and to submit any additional information he wished to be considered as part of the appeal. Liberty conducted a full and fair review of the appeal and accompanying materials, and concluded the denial of benefits will be maintained.

At this time, Mr. Keathley's administrative right to review is exhausted; no further review will be conducted by Liberty and the claim will remain closed. Mr. Keathley may request to receive, free of charge, copies of all documents relevant to his claim. Mr. Keathley has the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company of Boston rights and defenses under the above captioned Policy, and all rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Decisions made by Liberty Life Assurance Company of Boston are based on the provisions outlined in Acxiom Corporation Policy. These provisions are not contingent on decisions made by either the Social Security Administration or other disability-determining entities.

If you require language translation assistance, please contact Liberty Life to initiate a service provided free of charge to assist with understanding your claim and appeal rights.

如果您需要翻译方面的帮助，请联系我，我会免费为您服务以便了解您的要求和诉求。

Shá ata' hane'go shiká a'doowol nínízingo saad hosiníł'į́' dóó ná'ookąąh nííní'ąągo naaltsoos nííniltsoozígíí hazhó'ó bik'idí'deeshtį́į́ł nínízingo doo bą́ąh ílíníígóó níká a'doowoł éí biniiyé shił hodíílnih áko ákwe'égi níká adeeshwoł.

Si necesita traducción, contácteme para iniciar un servicio gratuito a fin de ayudarle a entender sus derechos de reclamo y apelación.

Kung nangangailangan ka ng tulong sa translation, mangyaring makipag-ugnayan sa akin upang gumamit ng serbisyong ibinigay nang walang bayad upang matulungan kang maunawaan ang iyong mga karapatan sa paghahabol at pag-aapela.

If you have any questions regarding this matter, please contact me.

Sincerely,

Michelle Cole
Appeal Review Consultant
Phone No.: (888) 437-7611 Ext. 16404
Secure Fax No.: (603) 430-1942

Social Security Administration
# Retirement, Survivors and Disability Insurance
Notice of Award

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: April 17, 2016
Claim Number: [redacted]

2571 3 MB 0.699 T16 MAAD296 PL1 S296 M3 PC7 160413
2571 TIMOTHY S KEATHLEY
239 HY 225 WEST
GREENBRIER, AR 72058
9, 11

EXHIBIT
C

0201P3XA500315?*NOTAFP.X3.PBMCSNOT.PC7.R160413.PAM 00000100 0026010635686542665972058

You are entitled to monthly disability benefits beginning June 2016.

**The Date You Became Disabled**

We found that you became disabled under our rules on December 2, 2015.

To qualify for disability benefits, you must be disabled for five full calendar months in a row. The first month you are entitled to benefits is June 2016.

**What We Will Pay And When**

- You will receive $2,481.00 for June 2016 around July 20, 2016.
- After that you will receive $2,481.00 on or about the third Wednesday of each month.
- These and any future payments will go to the financial institution you selected. Please let us know if you change your mailing address, so we can send you letters directly.
- The day of the month you receive your payments depends on your date of birth.

**Other Social Security Benefits**

This benefit is the only benefit you can receive from us at this time. In the future, if you think you might qualify for another benefit from us, you will need to apply again.

Enclosure(s):
Pub 05-10077
Pub 05-10153

## Your Responsibilities

We based our decision on information you gave us. If this information changes, it could affect your benefits. For this reason, it is important that you report changes to us right away.

We have enclosed a pamphlet, "What You Need To Know When You Get Social Security Disability Benefits." It tells you what you must report and how to report. Please be sure to read the parts of the pamphlet that tell you what to do if you go to work or your health improves.

A vocational rehabilitation or employment services provider may contact you to help you in going to work. The provider may be from a State agency or work under contract with Social Security.

If you go to work, we have special rules that let us continue your cash payments and health care coverage. To learn more about how work and earnings affect disability benefits, visit our website at www.socialsecurity.gov/work/. You may also call or visit any Social Security office to ask for the following publications:

- Social Security - Working While Disabled...How We Can Help (SSA Publication No. 05-10095).
- Social Security - If You Are Blind–How We Can Help (SSA Publication No. 05-10052).

## Your Benefits May Be Taxed

You may have to pay taxes on the benefits you get from us. Part of your Social Security benefits may be taxed if:

- you are single and your total income is more than $25,000 or
- you are married and you and your spouse have total income of more than $32,000.

You can decide if you want to have federal taxes withheld from your benefits. If you want taxes withheld, you need to complete and return a Form W-4V, Voluntary Withholding Request. You can get Form W-4V from the Internal Revenue Service by calling 1-800-829-3676. You can also get this form at www.socialsecurity.gov/planners/taxes.htm on our website. After you complete and sign the form, return it to your local Social Security office by mail or in person.

You can find more information on paying taxes in the enclosed pamphlet, "What You Need To Know When You Get Social Security Disability Benefits".

[redacted]



*0202P3X.A5003157*NOTAFP.X3.PBMCSNOT.PC7.R160413.PAM 00001100 0028010635686542665972058

## Do You Disagree With The Decision?

If you do not agree with this decision, you have the right to appeal. We will review your case and look at any new facts you have. A person who did not make the first decision will decide your case. We will review the parts of the decision that you think are wrong and correct any mistakes. We may also review the parts of our decision that you think are right. We will make a decision that may or may not be in your favor.

- You have 60 days to ask for an appeal.
- The 60 days start the day after you receive this letter. We assume you received this letter 5 days after the date on it unless you show us that you did not receive it within the 5-day period.
- You must have a good reason if you wait more than 60 days to ask for an appeal.
- You can file an appeal with any Social Security office. You must ask for an appeal in writing. Please use our "Request for Reconsideration" form, SSA-561-U2. You may go to our website at www.socialsecurity.gov/online/ to find the form. You can also call, write, or visit us to request the form. If you need help to fill out the form, we can help you by phone or in person.

## Things To Remember For The Future

Doctors and other trained staff decided that you are disabled under our rules. But, this decision must be reviewed at least once every 3 years. We will send you a letter before we start the review. Based on that review, your benefits will continue if you are still disabled, but will end if you are no longer disabled.

## If You Want Help With Your Appeal

You can have a friend, representative, or someone else help you. There are groups that can help you find a representative or give you free legal services if you qualify. There are also representatives who do not charge unless you win your appeal. Your local Social Security office has a list of groups that can help you with your appeal.

If you get someone to help you, you should let us know. If you hire someone, we must approve the fee before he or she can collect it. And if you hire a representative who is eligible for direct pay, we will withhold up to 25 percent of any past due benefits to pay toward the fee.

## Suspect Social Security Fraud?

Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline at 1-800-269-0271 (TTY 1-866-501-2101).

**If You Have Questions**

We invite you to visit our website at www.socialsecurity.gov on the Internet to find general information about Social Security. If you have any specific questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-855-727-3599. We can answer most questions over the phone. If you are deaf or hard of hearing, you may call our TTY number, 1-800-325-0778. You can also write or visit any Social Security office. The office that serves your area is located at:

SOCIAL SECURITY
2475 CHRISTINA LN
CONWAY AR 72034

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

Carolyn W. Colvin

Carolyn W. Colvin
Acting Commissioner of
Social Security